TARLEA v CRABTREE

Docket No. 244330. Submitted February 3, 2004, at Lansing. Decided July 13, 2004, at 9:15 A.M. Leave to appeal sought.

Teodor and Julia Tarlea, as co-personal representatives of the estate of Jeremy Allen Tarlea, deceased, brought an action in the Washtenaw Circuit Court against Saline High School football coaches Jack Crabtree, Mike Price, Randy Dunny, and others, claiming gross negligence in the death of Jeremy, a high school football player who died after attending a preseason conditioning camp conducted by the coaches. The court, Donald E. Shelton, J., denied the defendant coaches' motion for summary disposition, which was brought on the basis of governmental immunity. The defendant coaches appealed.

The Court of Appeals *held*:

1. From the evidence presented, no reasonable trier of fact could conclude that the defendants' conduct demonstrated gross negligence in Jeremy Tarlea's death, so the trial court erred when it held that there was a question of fact regarding the allegation of gross negligence by the defendants.

2. Gross negligence is defined as "conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results." MCL 691.1407(2)(c). Also, no liability attaches to the misconduct of a governmental employee unless the tortious behavior is the proximate cause of the injuries, that is, the one most immediate, efficient, and direct cause. In this case, no reasonable person could conclude that the coaches acted with a substantial disregard for the safety of the students that it could be classified as so reckless as to demonstrate a substantial lack of concern for whether an injury resulted to a student, or conclude that the coaches' conduct was the proximate cause of Tarlea's death. The trial court thus erred in failing to summarily dismiss the case.

Reversed; judgment entered in favor of defendants Crabtree, Price, and Dunny.

GOVERNMENTAL IMMUNITY — GROSS NEGLIGENCE — RECKLESS DISREGARD — PROXIMATE CAUSE.

Governmental immunity protects a governmental employee acting

within the scope of his authority; for a claim of gross negligence to proceed against a governmental employee, the plaintiff must demonstrate both that the defendant acted in a manner so reckless as to demonstrate a substantial lack of concern for whether an injury resulted to the plaintiff and that the defendant's action was the proximate cause, i.e., the one most immediate, efficient, and direct cause, of the plaintiff's injuries.

*Frederic M. Rosen, P.C.* (by *Frederic M. Rosen*) (*Bendure & Thomas* by *Mark R. Bendure*, of counsel), for the plaintiffs.

*Cox, Hodgman & Giarmarco, P.C.* (by *Timothy J. Mullins* and *Timothy R. Noonan*), for defendants Crabtree, Price, and Dunny.

Before: SAWYER, P.J., and SAAD and BANDSTRA, JJ.

SAAD, J. Defendants-appellants Jack Crabtree, Mike Price, and Randy Dunny[1] appeal a trial court order that denied their motion for summary disposition pursuant to MCR 2.116(C)(7) on the basis of governmental immunity. We reverse, enter judgment in favor of defendants, and dismiss plaintiffs' claims against defendants.

### I. OVERVIEW OF THE CASE

This appeal poses the question whether defendants, high school coaches, are responsible in tort, or are immune from suit, for the unexpected and tragic death of one of forty-one high school football players who attended a three-day, preseason football conditioning camp. The regulations of the Michigan High School Athletic Association (MHSAA) mandate that no fewer than the first three days of football practice each season be conducted with no equipment other than footballs,

---

[1] The remaining defendants are not parties to this appeal; accordingly, we refer to defendants-appellants simply as "defendants."

helmets, and football shoes.[2] This regulation was designed to ensure that the players received adequate conditioning before beginning practices in full equipment. The three days of conditioning may be completed at a summer camp as long as teams comply with the no-equipment regulation. The coaches scheduled the three-day camp to comply with this MHSAA-mandated, no-equipment training.

Under Michigan law, defendants are governmental employees and, with limited exceptions, are statutorily entitled to governmental immunity by reason of the governmental tort liability act (GTLA), MCL 691.1401 *et seq.* Michigan statutory law provides that a governmental employee is not responsible in tort for personal injuries unless the governmental employee is grossly negligent, which the statute defines as " 'conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results.' "[3] Further, our Supreme Court has also ruled that no liability attaches to the misconduct of a governmental employee unless the tortious behavior is *"the* proximate cause"[4] of the plaintiff's injuries, that is to say "the one most immediate, efficient, and direct cause . . . ."[5]

---

[2] The MHSAA previously had a statutory basis, but the relevant statutory provisions were repealed by 1995 PA 289. *Kirby v MHSAA,* 459 Mich 23, 24 n1; 585 NW2d 290 (1998). Participation by a school district in the MSHAA is voluntary. See *Reid v Kenowa Hills Pub Schools,* 261 Mich App 17, 20; 680 NW2d 62 (2004). However, " 'compliance with MHSAA rules on the part of student athletes is an appropriate and justifiable condition of the privilege of participating in interscholastic athletics under the auspices of the MHSAA.' " *Id.* at 24, quoting *Cardinal Mooney High School v MHSAA,* 437 Mich 75, 81; 467 NW2d 21 (1991), also quoted in *Kirby, supra* at 34.

[3] *Stanton v Battle Creek,* 466 Mich 611, 619; 647 NW2d 508 (2002), quoting MCL 691.1407(2)(c); *Maiden v Rozwood,* 461 Mich 109, 122; 597 NW2d 817 (1999), quoting MCL 691.1407(2)(c).

[4] *Robinson v Detroit,* 462 Mich 439, 458-459; 613 NW2d 307 (2000), quoting MCL 691.1407(2)(c) (emphasis added).

[5] *Robinson, supra* at 445-446, 459, citing MCL 691.1407(2)(c).

Therefore, for a plaintiff to be successful in a tort action against a governmental employee, the plaintiff must prove both that (1) the governmental employee's conduct demonstrated a substantial lack of concern for whether his conduct would cause injury to the plaintiff, and (2) the alleged misconduct was *the* proximate cause of the plaintiff's injury.

Here, the trial court erroneously concluded that it was for the jury to decide if defendants were entitled to the protection of governmental immunity because the trial court incorrectly ruled that there were issues of fact regarding whether defendants were grossly negligent as defined by the GTLA and whether the alleged tortious conduct was *the* proximate cause of Tarlea's death, as set forth in the statute and interpreted by our Supreme Court.

If a reasonable person could conclude that the coaches exhibited a "substantial lack of concern," MCL 691.1407(2)(c), for the safety of the students in their charge, then this matter clearly should be submitted to a jury for the ultimate determination of liability. If, on the other hand, as here, no reasonable person could so conclude, then the trial court is obliged, under Michigan law, to summarily dismiss this suit. And, because no reasonable person could conclude that these coaches acted in substantial disregard for the safety of the students, or that the coaches' conduct was *the* proximate cause of Tarlea's death, the trial court clearly erred in failing to summarily dismiss this case, and we reverse the decision of the trial court and enter judgment dismissing this suit against these coaches.

## II. FACTS AND PROCEDURAL HISTORY

Jeremy Tarlea was a high school student who was also a second-year member of the varsity football team

at Saline High School ("the school"), which team was coached by defendants. In August 2000, the school scheduled a three-day, preseason conditioning camp for the football team. The purpose of the camp was to provide the players with physical conditioning without pads and equipment before starting practices, scrimmages, and later games, in full equipment, pads, and helmets.

No player was permitted to participate in the camp without a physical examination performed by a physician, and each was required to submit a medical clearance from his physician. Dr. Yuktanand Singh, Tarlea's uncle and family physician, testified that he conducted the mandatory physical four days before camp and found Tarlea to be in completely normal health. Dr. Singh further opined that Tarlea was capable of participating in all rigorous activity without any limitations, including calisthenics and running, and that, had he been asked, he would also have cleared Tarlea to engage in track and cross-country. Dr. Singh provided Tarlea with the required medical clearance, and Tarlea, in turn, provided the medical clearance to his coaches. One of Tarlea's teammates made the coaches aware of a potential health problem, and the coaches did not allow that student to participate until the student obtained medical clearance.

In addition to the medical clearance forms, each player was required to sign an acknowledgment form that outlined the risks, which included injury and death, associated with participation in high school athletics. Each player was also required to have his parents sign the acknowledgment form, as well as a consent form, before being allowed to participate in the camp. Tarlea and his parents signed these documents.[6]

---

[6] Defendants were made aware of the waivers and acknowledgements signed by the students and their parents. They were also advised of the

Tarlea's family and friends were of the opinion that he was in the best shape of his life. Before attending Camp Sequoia, Tarlea participated in weight lifting and track conditioning workouts (fourteen sessions), and was able to bench press 350 pounds in a charity "Lift-A-Thon."

At Camp Sequoia, the student athletes were provided with a healthy diet and plenty of water at all times. The camp, its purpose and procedures, and the importance of proper hydration were explained to the students and parents. The coaches made sure there was water available throughout the camp while the students were exercising. One of Tarlea's teammates stated that Tarlea himself brought twenty-four bottles of water with him to the camp, drank all of them before the August 9, 2000, exercise session, and that Tarlea drank at least two bottles of Gatorade the night before the run. During practices, the coaches encouraged the students to take water breaks and to drink plenty of water. The coaches never discouraged students from resting or taking water breaks. As a further safety measure, the coaches stationed themselves around the running track so they could observe the students.

On August 9, 2000, the team awoke at 6:45 A.M. to prepare for morning practice. At 7:00 A.M., the team completed a two-hundred-yard run. Meteorological records show that the temperature was seventy-one degrees Fahrenheit with a relative humidity of ninety-three percent. Team members then completed stretching exercises before running a series of ten sixty-yard runs, with the first four being at "half speed," the next

physical examination performed by Tarlea's uncle four days before the camp, and of the fact that the physician had placed no limitations or restrictions on Tarlea's ability to engage in the three-day, preseason football camp.

four at "three-quarters speed," and the final two at "full speed." The team's next exercise consisted of four sets of "up downs,"[7] with two-minute breaks between each set. Jeremy stepped out of the "up down" exercise for a few minutes to take a break and then resumed the exercises.

After the "up downs," the team went on a 1-1/2-mile run at each member's own pace—the run was not timed. The students, including Tarlea, could have declined to engage in the 1-1/2-mile run without penalty; indeed, some students did decline to run. When these students asked to sit out the run, the coaches advised them to sit in the shade and drink some fluids. Those who participated in the run could stop at any time to rest, take a drink of water, or sit under the shade of a tree. The students ran without wearing any pads or helmets; the students wore shorts and T-shirts, and some students, including Tarlea, removed their shirts during the run.

One of Tarlea's teammates testified that Tarlea looked as though he was in great shape. The teammate further testified that Tarlea took a water break before the run and looked tired, but that everyone looked tired during the run. The teammate and coaches stated that they did not observe anything out of the ordinary with respect to Tarlea.

When Tarlea crossed the finish line at the end of his run, his legs buckled, and some of his teammates helped him get water. The coaches ran to Tarlea and found him conscious but unresponsive. They then decided to immediately take Tarlea to nearby Herrick Hospital. The coaches drove Tarlea to the hospital in an air-conditioned vehicle.

---

[7] "Up downs" consist of running in place, then dropping to do push-ups, then running in place.

Tarlea was admitted to Herrick Hospital with a body temperature of ninety-seven degrees. His white blood cell count and several enzyme levels were at abnormally high levels. His body temperature rose to 101.7 degrees. The Herrick Hospital Emergency Department then cooled Tarlea with ice and wet towels and transferred him by air to the University of Michigan Hospital Emergency Department. Upon arrival at the University, Tarlea's temperature had risen to 108 degrees. University physicians continued cooling efforts and transferred Tarlea to the hospital's pediatric intensive care unit. Sadly, Tarlea never regained consciousness and died one week later on August 16, 2000. His medical records reflect a diagnosis of heat stroke with multisystem organ failure, shock, consumptive coagulopathy, liver failure, kidney failure, cerebral edema, and a *Pseudomonas* bacterial infection as the causes of death. Tarlea's abnormally high white blood cell count further reinforced the diagnosis of an infection. An autopsy had been planned, but Tarlea's parents withheld consent for this procedure.

Approximately forty-one players participated in the camp and, aside from Tarlea, no student fell ill as a result of the exercises at the three-day camp.

### III. STANDARD OF REVIEW

We review de novo a trial court's grant or denial of summary disposition under MCR 2.116(C)(7). *Poppen v Tovey*, 256 Mich App 351, 353; 664 NW2d 269 (2003). "In reviewing the order, we must give consideration to the affidavits, depositions, admissions, and other documentary evidence filed by the parties, and determine whether they indicate that defendant[] [is] in fact entitled to immunity." *Id.* at 353-354. A plaintiff "must 'allege facts justifying the application of an exception to

governmental immunity.' " *In re Estate of Marchyok,*
260 Mich App 684, 687; 679 NW2d 684 (2004) (citation
omitted). Though the issue whether a governmental
employee's conduct constituted gross negligence under
MCL 691.1407 is generally a question of fact, a court
may grant summary disposition under MCR 2.116(C)(7)
" 'if, on the basis of the evidence presented, reasonable
minds could not differ . . . .' "[8] The GTLA "takes great
pains to protect government[al] employees to enable
them to enjoy a certain degree of security as they go
about performing their jobs."[9] "The purpose of sum-
mary disposition is to avoid extensive discovery and an
evidentiary hearing when a case can be quickly resolved
on an issue of law."[10] Accordingly, when no reasonable
person could find that a governmental employee's con-
duct was grossly negligent, our policy favors a court's
timely grant of summary disposition to afford that
employee the fullest protection of the GTLA immunity
provision by sparing the employee the expense of an
unnecessary trial. This view is bolstered by our court
rules. Generally, an appeal as of right may only be taken
from a "final order" that disposes of all claims of all
parties. MCR 7.202(6)(a)(i). However, the court rules
expand the definition of "final order" to allow an appeal
as of right from an order that denies summary disposi-
tion in favor of a governmental employee on the basis of
governmental immunity regardless of whether the or-
der disposes of all of the claims of all parties. MCR
7.202(6)(a)(v).

---

[8] *Jackson v Saginaw Co,* 458 Mich 141, 146; 580 NW2d 870 (1998)
(citation omitted); see also *Xu v Gay,* 257 Mich App 263, 267; 668 NW2d
166 (2003).

[9] *Gracey v Wayne Co Clerk,* 213 Mich App 412, 418; 540 NW2d 710
(1995), overruled on other grounds *American Transmissions, Inc v
Attorney General,* 454 Mich 135; 560 NW2d 50 (1997).

[10] *Shepherd Montessori Ctr Milan v Ann Arbor Charter Twp,* 259 Mich
App 315, 324; 675 NW2d 271 (2003).

IV. ANALYSIS

Generally, governmental employees acting within the scope of their authority are immune from tort liability except in cases in which their actions constitute gross negligence. *Maiden v Rozwood*, 461 Mich 109, 121-122; 597 NW2d 817 (1999). Gross negligence is defined by the GTLA "as 'conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results.' " *Stanton v Battle Creek*, 466 Mich 611, 619; 647 NW2d 508 (2002), quoting MCL 691.1407(2)(c); *Maiden, supra* at 122, quoting MCL 691.1407(2)(c). Furthermore, the grossly negligent misconduct must be *"the* proximate cause," *Robinson v Detroit*, 462 Mich 439, 458-459; 613 NW2d 307 (2000), quoting MCL 691.1407(2)(c) (emphasis added), of the plaintiff's injuries, that is to say "the one most immediate, efficient, and direct cause . . . ." *Robinson, supra* at 459, citing MCL 691.1407(2)(c). Here, the trial court erred when it denied summary disposition in defendants' favor because reasonable minds can only conclude that defendants' conduct was not, as a matter of law, "so reckless as to demonstrate a substantial lack of concern for whether an injury results." *Stanton, supra* at 619; *Maiden, supra* at 122. Furthermore, were we inclined to hold otherwise, we would nevertheless hold that defendants' conduct was not the proximate cause of Tarlea's death as defined by our Supreme Court in *Robinson* and by the Legislature in the GTLA.

A. GROSS NEGLIGENCE

No reasonable person could conclude that these coaches exhibited a substantial disregard for the safety of the student athletes. Indeed, the facts of this case show just the opposite: that defendants exhibited a high degree of care and professionalism in discharging their roles as coaches.

By statute, to be liable in tort, a governmental employee must act with gross negligence. MCL 691.1407(2); *Stanton, supra* at 619; *Maiden, supra* at 122. Gross negligence is defined as "conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results." *Id.* Simply alleging that an actor could have done more is insufficient under Michigan law, because, with the benefit of hindsight, a claim can always be made that extra precautions could have influenced the result. However, saying that a defendant could have taken additional precautions is insufficient to find ordinary negligence, much less recklessness. Even the most exacting standard of conduct, the negligence standard, does not require one to exhaust every conceivable precaution to be considered not negligent.

The much less demanding standard of care—gross negligence—suggests, instead, almost a willful disregard of precautions or measures to attend to safety and a singular disregard for substantial risks. It is as though, if an objective observer watched the actor, he could conclude, reasonably, that the actor simply did not care about the safety or welfare of those in his charge.[11]

As here, where defendants have taken numerous precautions and safeguards to protect the safety of the football players in their charge,[12] an objective observer must conclude that the coaches exhibited not reckless conduct, rather, a heightened regard for the safety of

[11] See, *e.g., Maiden, supra* at 122 ("[E]vidence of ordinary negligence does not create a material question of fact concerning gross negligence. Rather, a plaintiff must adduce proof of conduct 'so reckless as to demonstrate a substantial lack of concern for whether an injury results.' ") (citation deleted); see also *Jennings v Southwood*, 446 Mich 125,135-136; 521 NW2d 230 (1994); *Xu, supra* at 268-269.

[12] These precautions included, among other things, requiring parental permission, student consent, and medical release forms; providing the students with a healthy diet and an ample supply of water; stationing coaches around the practice field to monitor students' progress; and

the students. No reasonable person could conclude that they acted with "reckless disregard." Rather, the coaches' conduct showed that they performed their duties in a manner that exhibited care and concern for the student athletes. Rather than a substantial *lack* of concern, the coaches showed substantial concern for the well-being of their students.

Plaintiffs argue that defendants were grossly negligent because they exhibited reckless conduct in having students exercise in light of the prevailing temperature and humidity. However, the evidence suggested nothing inappropriate about running in the weather conditions of the day, and, indeed, one of plaintiffs' own experts testified that he did not feel it inappropriate to exercise in weather similar to that in which the team exercised the morning of August 9, 2000. Meteorological records show that the heat index, taking into account the temperature and humidity, was sixty-seven degrees, which is below the "danger zone" in which it would be hazardous to exercise. At the camp, they could simply practice in shorts without any gear at all, in much cooler weather. This type of conditioning was done to prepare them to compete later in games in August and September in worse conditions in terms of heat and humidity, in which the players would be fully suited up with pads and helmets.[13]

---

allowing students who did not wish to complete the 1-1/2 mile run to sit out of the exercise altogether, or to take rest breaks or water breaks at the student's discretion.

[13] We note the testimony of Frank Grimaldi, Jr., one of plaintiff's experts:

> *Q.* Now, given your own personal experience, there's nothing about the heat or humidity that would bar or prohibit running a couple miles on that particular day, would there, or for that matter running four miles?
>
> *A.* No.

Accordingly, we conclude that no reasonable trier of fact could conclude, on the basis of the evidence presented to the trial court, that defendants displayed "conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results." MCL 691.1407(2); *Stanton, supra* at 619; *Maiden, supra* at 122. Therefore, we hold that the trial court erred when it denied summary disposition in favor of defendants.

B. PROXIMATE CAUSE

Were we to hold that defendants' conduct constituted gross negligence, which we do not, we would nevertheless conclude that defendants' conduct was not *the* proximate cause as defined by the GTLA and *Robinson*. MCL 691.1407(2)(c); *Robinson, supra* at 458-459. To be held liable under the GTLA, a defendant's gross negligence must be *the* most immediate cause of a plaintiff's injuries—it is not enough that the defendant's actions simply be "a" proximate cause. *Id.*

Here, the evidence presented to the trial court shows that defendants' conduct was clearly not *the* proximate cause of Tarlea's death. No reasonable person could find that the coaches' alleged misconduct was *the* proximate cause of Tarlea's death. The coaches' alleged failure to prevent Tarlea from participating in the team exercises on August 9, 2000, is not *the* proximate cause of Tarlea's death under the holding of *Robinson*. All the students, including Tarlea, had the choice of participating or not participating in the run. Some students decided not to participate, but Tarlea voluntarily opted to run. Also, players who opted to participate in the run, including Tarlea, could stop at any time to rest and get water, and could decide not to complete the run. Further, one week intervened between the time of the 1-1/2-mile run and Tarlea's unfortunate death in the hospital. His test

results showed a high white blood cell count, indicative of an infection. Over the course of a week in the hospital, Tarlea experienced multiple organ failures, severely elevated enzyme levels, and a *Pseudomonas* infection. It was not clear to Tarlea's physicians what caused the various organ failures, or at what point he contracted the *Pseudomonas* infection. Tarlea's family physician, Dr. Singh, noted at the time of his physical examination of Tarlea that Tarlea complained of dermatitis and abdominal pain, but did not note either of these problems on the medical clearance form provided to defendants. Further, Dr. Singh ordered blood tests during the examination, but apparently did not have the results in Tarlea's record. Hospital tests revealed that Tarlea's death could have been caused by one of any number of ailments. University physicians who treated Tarlea opined that a person of Tarlea's age and in good health should not have experienced any difficulty running on the day in question. Tarlea's treating physicians testified that they did not know why he was the only person on a team of forty-one student-athletes performing the same exercises to fall ill after the run. An autopsy, which could have pinpointed Tarlea's cause of death, was never performed. Indeed, without an autopsy, to say precisely what caused Tarlea's death is pure speculation.

Based on the evidence presented here, we conclude that no reasonable trier of fact could conclude that defendants' conduct was the most immediate, proximate cause of Tarlea's death. Accordingly, we hold that the trial court erred when it held that there was a question of fact regarding whether defendants' alleged gross negligence was the proximate cause of Tarlea's death and that the trial court improperly denied summary disposition in favor of defendants.

### V. CONCLUSION

Because no reasonable trier of fact could find these governmental employees liable on the basis of the evidence presented, we reverse the order in which the trial court denied summary disposition in favor of defendants, dismiss plaintiffs' claims against defendants, and enter judgment in favor of defendants. See MCR 7.216(A)(7).